We'll begin with the first argument on the calendar, that's in re. Clinton Nurseries, Inc. Mr. Henze, are you here? I'm here, Your Honor. Great, and you can see and hear all right? I can, Your Honor, and for the record, Eric Henze for the appellant. Great, all right, and Mr. Clark for the appellee? Yes, Your Honor, I can hear you as well, and Mr. Henze. Great, okay, so you've each got ten minutes, but Mr. Henze has reserved two minutes for rebuttal, so that means eight minutes out of the gate. Mr. Henze, the floor is yours. Thank you, Your Honor. Good morning, and may it please the Court. Your Honor, this appeals a de novo review of a bankruptcy court order to dismiss the claim by my client, a small business with some 200 employees, that 28 U.S.C. 1930A, as currently drafted, is non-uniform within the meaning of the, and therefore unconstitutional under Article I, Section 8, Clause 4 of the Constitution. Just in a nutshell, Your Honors, effective October 27, 2017, Congress amended 28 U.S.C. 1930A-6 to substantially increase U.S. trustee fees paid in Chapter 11 bankruptcy cases. Under the new fee structure, Clinton Nurseries would owe $631,920.02. Under the old fee structure, it would have owed approximately $230,000. The problem is that there are six judicial districts that are not part of the U.S. trustee system. Under 28 U.S.C. 1930A-7, the fees in those districts are paid to bankruptcy administrators because there's a bankruptcy administrator system that's under the judiciary as opposed to the U.S. trustee system. So in Alabama and North Carolina, there was a different fee structure in place for approximately 11 months, meaning if my clients had filed Chapter 11 in one of those six districts, they would have paid some $400,000 less than they did in their cases. And the claim is that that violates Article I, Section 8, Clause 4 of the Constitution, which grants Congress the power to establish uniform laws on the subject of bankruptcies throughout the United States. Your Honor, I have four arguments, and I want to address any concerns of the Court. The first, and this is not an argument the U.S. trustee made below, was addressed briefly in their brief. The U.S. trustee has provided the Court with two recent cases, the SCI Direct and the Hammons case, and there is now a series of cases that have come out, including the MF Global Sun Edison cases from the Southern District of New York, which are now on appeal but in abeyance before this Court. Essentially, these cases hold there is no uniformity problem because there are two different systems with their own geographically isolated problems, and so for Congress to address geographically isolated problems is permissible within the Constitution. A couple of problems, that first, in some sense, it's just kind of a gravity-defying argument, Your Honors. There was a huge disparity in the fees paid based on whether you are a U.S. trustee district or a bankruptcy administrator district. You can't get away from that. Can I just ask one question? If you are correct that there's a lack of uniformity between U.S. trustee districts and B.A. districts, would that also invalidate the entire U.S. trustee system on the theory that it simply was not implemented in a way that's a uniform rule for bankruptcy, and therefore there ought not to be a U.S. trustee unless it's implemented in every district? No, I don't think so, Your Honor. Why not? Well, I don't think so, and the why not is the cases say, and I believe the U.S. trustee here agrees, that the bankruptcy administrator performs essentially the exact same functions as the U.S. trustee system. So I understand the court's question in that there is this disuniformity because 88 judicial districts have U.S. trustee system and six have the bankruptcy administrator system. But from the perspective of a debtor or any other party who is participating in a Chapter 11 case, the same exact functions are being provided. They're being provided by different parts of the government. But I don't believe that that goes to the type of uniformity problem that the Constitution provides. So I would understand your argument is that the uniformity is seen only through the lens of the debtors and creditors. I think that's right, Your Honor. And, in fact, on this disuniformity issue, the Supreme Court case that the courts that have said there's not a uniformity problem rely on is the rail reorganization case. And in that case, Congress had implemented a new provision that only applied in the east and midwest of the country. It was specifically to address eight railroads that had filed bankruptcy. And what Congress did was it drew a circle around those railroads. That's when ConRail came into being. And there was a uniformity challenge. But what Justice Brennan held was that because there were no railroad bankruptcies outside of that region, there was not a problem. So really, Justice Brennan's decision was a no harm, no foul kind of argument. But I think that underlying that is that the focus is not on is there a formal non-uniformity versus what's the impact on actual parties involved in the cases. And in there, Justice Brennan found there was no impact because there were no railroads in bankruptcy outside of that region. Go ahead, Judge Bradley. Assuming for the moment that we were to agree with you that uniformity as to these fees is required, why wouldn't we conclude that the law 1938-7 satisfies that because may is permissibly construed as shall, which makes sense because the law was after all enacted to eliminate the constitutional concern identified in San Angelo. And we would therefore conclude that what 1938-7 does is give the judicial authority but only to do what is necessary for uniform fees. The consequence of that, I'd suggest to you, is that your client is not the victim of any lack of uniformity permitted by Congress. There may be a question over the permissibility of the judicial conference's actions, but that would not be a ground to absolve your client from the fees that Congress intended to be uniform throughout the system. Why should we not view this case that way? Your Honor, it would require you to rewrite the statute in a way that I believe is not permissible. At what point? I mean, we have precedent that says that may can sometimes be construed as shall, and after all, we have the principle that construction is to be consistent with constitutionality, not inconsistent. So what part of the statute would we be impermissibly rewriting? You would be impermissibly rewriting 8-7 to say that may means shall. But it's a matter of construing what Congress meant by may there, right? Yes, and Your Honor, I agree 100%, and as the bankruptcy court said, you should look for a construction of the statute that is fairly possible by which the constitutional question can be avoided. But, with all due respect, you can't judicially rewrite the statute. The word has to be given. They use shall in the very next sentence, don't they? Well, actually, Your Honor, they use, in the statute in 1930, Congress uses the word shall ten times. It uses the word may seven times. But in the section, in 8-7, it says the judicial conference may require the debtor, and such fees shall be deposited as offsetting receipts. So there seems to be some distinction between the two, wouldn't you think? Your Honor, I think you and I are agreeing. Thank you, Your Honor. So the answer is yes, but I'll go beyond just what's in 8-7. As I said, in 1930 overall, Congress used shall and may repeatedly. So for this court to find that in this one place, that may means shall, the court would have to assume that Congress essentially was using may and shall throughout the statute in really an erratic, undeliberate fashion. And that's why I say, Judge Ragge, I don't, I 100% agree that where a fair construction is possible to avoid the constitutional problem, that you give it that construction. I understand that that's the difficulty, and we'll hear from your adversary as to how he thinks we can clear the hurdle. But I mean, I would like you, Mr. Henze, to explain sort of what the fix is, because if that's the problem, your fix is just to get rid of the 2017 amendments, right? Isn't that what you're saying? That is my fix, Your Honor. Yes. But that doesn't cure the may-shall problem. Well... As a practical matter, it does, because the judicial conference sort of was going along prior to the 2017 amendments. But isn't it still a problem for a facial challenge that the statute says may? It is a problem. And you just threw me another softball, Your Honor, because I think you just put your finger on it, is that for a period of years, in some sense, the judicial conference did go along. The genesis of this A6-A7, and this is in the brief, and there's law review commentary on this, is this was a political deal. For whatever reason, Congress decided to carve out these six judicial districts and not have them be part of the U.S. trustee system, have them be part of this bankruptcy administrator system. And when you do that, when the sausage gets made, and it gets made in a way that's not consistent, you potentially are going to have problems. When A7 was put in place, it was at the suggestion of the judiciary. The suggestion came from the Federal Judicial Conference. And the language of A7 clearly evidences an intent that the Judicial Conference was going to have discretion. So in some sense, and I know this is a strong statement, but the way Congress set this up, this statutory scheme along with the Constitution, in some sense, Congress put itself in a box. It can only go, under what's here, it can only go where the Federal Judicial Conference is going to let it go. And I understand that's a strong statement, but that's the system that Congress set up. And so, Your Honor, as you said, the Judicial Conference went along for a long time and increased the fees as the fees on A6 went up. Here, if you look at the Committee on Bankruptcy Administration report that was done in 2018 that addressed this, the committee specifically addressed exactly the concerns that have arisen. That is that this fee increase is so extraordinary. And in my brief, I give a chart on the magnitude of the fee increase, where in some cases it's up to 1,000%. And I can tell you as a small, I represent small businesses in Chapter 11s. This fee increase is catastrophic. Let me ask you, our concern is not the wisdom of the fee increase. Your complaint is uniformity. As I understand it, the Judicial Conference has now raised the fees, but only effective, I'm sorry, I think it's got to be effective date. So, are we basically dealing just with a window here where you're saying that for bankruptcies in the trustee system between when Congress raised the fee and when the Judicial Conference raised the fee, you can only be charged the old rate? Or does your argument go further and dispute whether anybody can have their fees raised after 2018, after the Judicial Conference action? I'm not sure I understand the question, Your Honor. Well, I want to know how broad the relief you're asking for is. Does it only pertain to bankruptcies in the window between enactment of the 1930 A7 Amendment and the Judicial Conference's adoption of the same fee? Is that the only period we're talking about? Yes. If your client were in bankruptcy proceedings, initiated bankruptcy proceedings today, you'd be paying the higher fee, right? Absolutely. Yes, Your Honor. Okay. And so it's for cases, the window, but the window does dial back because the U.S. trustee's position. This is not an issue in this case. It's an issue in some of the other cases. The U.S. trustee takes the position, and this is being litigated, as to the retroactivity, so the pre-October 27, 2017, applicability of the fee increase. Right, that's another case. That's another case. I'm not sure I understood your position. Anything from October 1, 2018 forward, then yes, Your Honor, the fee increase is applicable. Yes. Could you tell me how that argument ties into what I understand your challenge to be purely a facial challenge, right? Not as applied? Correct. So how is it that you have a facial challenge to the language of the statute, but what I think you're arguing is that your argument would not be valid after October 1, 2018. How does that work, considering the language of the statute hasn't changed? Aren't you really making an as-applied challenge based on how it was implemented at a particular point in time? I think it's an odd—I think of the as-applied challenge to mean there's a law, and it's facially constitutional, but some state actor, typically some part of the executive, is applying it improperly in a way that violates some constitutional provision. I don't think that's quite what we have here, Your Honor, because here it's—the argument is not that the Federal Judicial Conference misapplied the law. The argument is that the Federal Judicial Conference did exactly what A7 authorized it to do, which is it gave the Judicial Conference discretion. The Judicial Conference could raise fees up to the amount of A6. I would argue under A7, the Judicial Conference could have said, this is so outrageous, these fees are so high, we're going to drop fees altogether. I think under A7, the Judicial Conference absolutely would have been within its rights to do that. I think there's an interpretation of the statute that what A7 means is really that the equal, in some sense, is an upper bound as to what the Judicial Conference can do. I think there is at least a fair interpretation of the statute that says the Judicial Conference can set fees somewhere in between the A6 amount and zero. Just to go back to the facial as applied distinction, then, it almost sounds as what you're arguing is more an as applied challenge for a period of time, but just if and when the Judicial Conference raised the fees to an equal level, maybe then nobody had standing anymore to challenge it because they're not harmed in any way. But it's almost like a temporal as applied. Everyone in this window has the same as applied challenge. I'm just trying to figure out how to fit a claim with a temporal limitation, as I think you're arguing, with a facial challenge to a law. And I think, Your Honor, if you go back to the Rail Reorg case, what Justice Brennan said, to put it colloquially, is no harm, no foul. So there was this facial, I'll call it latent, problem in the Rail Reorg case. So I think under the Rail Reorg decision, if a railroad outside of the geographic region that Congress defined had filed bankruptcy, it would have been a problem. And I think the decision at least implicitly says that. So I don't disagree with you that from October 1, 2018 forward, there is this latent issue in the statute. And it could come up again. It could come up again. And it comes up again if, again, to put it colloquially, the Federal Judicial Conference decides not to, I'm going to say, to save Congress's bacon. Right, but that's a facial challenge. It's saying that it's happened now, it could happen again, and so the remedy then is you strike down the provision. You say that A7 didn't fix the problem that St. Angelo identified. But, Your Honor, I think that what the Rail Reorg decision instructs is that in a no harm, no foul situation, the facial issue goes away. So it's hard to see in the Rail Reorg decision how there wasn't that facial problem. I mean, Congress passes a statute that expressly applies in only one region. I understand what you're saying, but it seems to me that if you're just asking us to be creative, then why don't we just say that may means shall, and that will fix it too. A lot of things will fix it. But it doesn't seem like that's really what courts typically do. I don't want this to come out the wrong way. I think I'm not asking you to be creative. Well, you're asking us to go along and get along with respect to the way the Rail Reorg cases did, but don't rewrite the statute when it comes from making may into shall. Go along and get along with the Rail Reorg case. I'm looking at the Rail Reorg case where Justice Brennan essentially lays down a no harm, no foul rule. It was a uniformity case. Congress had put in place a structure in one region of the country, and the basis for Judge Brennan's holding was that there was no railroad that was in bankruptcy. I understand that, but it seems to me that your real beef is with the 2017 amendment raising the fees high, and then the judicial conference not matching. And your challenge is to the provision that gives the judicial conference discretion. That is not my challenge. It's a facial challenge to that section, isn't it? It's how A-6 and A-7 fit together. You're asking us to strike down the fee increase in A-6 because that's what your client is paying. That's correct. And you're saying that the fee increase in A-6 is invalid because an equivalent increase, mandatory increase, was not put in place in A-7. That's right. You're asking the remedy is to strike down the amendment to A-6. That's correct, Your Honor. But there's nothing wrong with A-6 if A-7 said shall, right? If A-7 said shall, then there would be nothing wrong with A-6. Yes, Your Honor. All right. We've gone way over, but you've reserved a couple of minutes for rebuttal. Let's hear from Mr. Clark for 10 minutes or more. Good morning, Your Honors. May it please the Court. I'm Jeff Clark from the Justice Department here on behalf of the U.S. Trustee Program. Let me start with this discussion of the distinction between facial and as applied because I think it's a really easy way to resolve this case. If you look on pages 21 to 22 in footnote 7, you'll see that the debtors of their brief, I'm sorry, of their opening brief, you'll see that they concede that they are not making an as applied challenge. That's on page 22 because it's a footnote that spans two pages. You'll also see that from 21 over a bit on to 22, they concede that they're not making an ultra virus challenge to the actions of the Judicial Conference. So that means, you know, I think in this case that they've given up on any attempt to say that there's an as applied problem. Hence, they're making a facial challenge. And in making a facial challenge, they're bound by the Salerno test, which says they have to establish that there are no set of circumstances under which this is a constitutional statute. And I submit to you that in response to Judge Radji's question to Mr. Henze, where he conceded that if there were a bankruptcy now coming into effect for one of his clients, that because the fees are equal, he wouldn't have a challenge. Well, that means that there is a circumstance under which this statute is constitutional. And so if you look at at A7, what it does is it confers at best for Mr. Henze. I think the better interpretation is the one that Judge Radji, you were indicating, which is to interpret this as a conferral of power on the Judicial Conference to make fees equal.  The concern with that, as Judge Sullivan pointed out, is it's not as if Congress didn't use the word shall in the statute. And so given that it did so, indeed, it did so right in the same section. Aren't we obliged to assume that the words were intended to have different meanings? Well, Your Honor, what I would say in response to that is that, look, you're dealing with the Judicial Conference acting essentially as the equivalent of an agency. They're empowered to make the fees equal. And given that they're empowered to make the fees equal on the best possible interpretation of A7 for Mr. Henze, that means that they can't meet the no set of circumstances test in Salerno. And their facial challenge fails right at that point. Now, I think you actually could interpret the second sentence shall in or the last sentence in A7 shall perhaps differently than Judge Sullivan was suggesting. Right. Because there's a reference in that to such fees shall be deposited under Section 1931. And so what fees are we talking about? We're talking about the obligation to pay equal fees. You know, perhaps conditionally if the Judicial Conference establishes that. But if you're dealing essentially with the situation where an agency or an agency like entity, you know, can establish equal fees, then you're not dealing with a facial challenge. You're dealing or you're dealing with a failed facial challenge because in this instance, right, it is entirely possible for this to be uniform. And basically, Mr. Henze conceded that at the moment, because the fees are equalized, they are uniform and therefore there's no constitutional problem. So I don't see given. There has been some commentary on whether the Salerno rule only applies in circumstance or best applies in circumstances where you don't know how something's going to be applied. As I understand your adversary's argument, at least for the window between January 2018 and October 2018, there was no question that it could not be applied equally in the trustee and the bankruptcy administrative systems because the Judicial Conference had not made equal fees during that period. So during that period, there was no way it could be. It could be constitutionally applied is their argument. Yes, Your Honor. I think that you would similarly ask a question about the constitutional avoidance canon right about about Ashwander. So you're dealing with the Judicial Conference. They would be faced with a situation where they should be reading the statute in a seven to apply the same equal fees in the bankruptcy administrator areas as in the U.S. trustee program areas. And that was another reason why it's it's facially constitutional. You know, I also think that in light of that way of interpreting the statute, right, that gets into our last argument, our remedy defense, which is Mr. Henzey seems to assume that if he can establish that there's a uniformity problem, that the remedy that flows from that has to be that you lower the fees. You lower them down. You equalize them down to the ones in the bankruptcy administrator areas. But I would submit to you that that is not the way at all to read this statute. When you're dealing with a remedy question like that, you have to approximate as best as possible what the outcome is that Congress would have intended. And they give you a highly reticulated graduated scale of fees that they mandate in a six for the vast majority of the country. Right. And and so the idea that those that fee system could be just thrown out the window and the extra fees that Congress deemed necessary to solve a fee crisis in the mid 2010s, you know, that that that is something that I don't think comports with how we do the fact that for a 10 month period or approximately 10 months, there were two different fees systems being applied depending on whether you were in trustee or a bankruptcy administrator district. Now, am I right in assuming that when the judicial conference made its conformity decision, but only effective October 2018, it was a retroactivity concern that prompted that it perhaps is. I don't I don't think that there's necessarily any record because it could go also to what what we think here. I mean, is there any way that a court could say, well, no. In even the bankruptcy administrative system, it went it became effective in January of 2018. Well, I think that that the basis for that, Your Honor, would be that the judicial conference adopted essentially a uniformity rule in 2001 in a report that it issued. So why the judicial conference chose to depart from that approach that had that had prevailed since 2001 up until 2018? We can't tell you, but I can tell you that Mr. Henzies disclaimed any challenge to that divergence to the judicial conference acting in an ultra virus way. Well, what I'm I'm perhaps not articulating clearly for you is if we think that uniformity is necessary, how do we achieve uniformity in these circumstances throughout 2018? So, Your Honor, yes, that that's what I was making as our last argument. So the last argument in our brief is about the remedy question. We think you would have to equalize the the the revenue, you know, the fee system up. You'd have to require if you were dealing with the bankruptcy administrator area, you would have to equalize those fees up. But you're not even dealing with the party that face that system. You're dealing with a party that clearly is in one of the areas that Congress specified should pay the higher fees. And how do you imagine that coming before us? I mean, no party is going to complain that they're being assessed the lower fee. So how would that come before the courts? Well, you know, one reason it might come before the courts is if an as applied challenge had not been disclaimed, if an ultra virus challenge had not been disclaimed. So I think, you know, the debtors here are sort of the victims of their own strategic choices. The other thing I'd like to say, since I see that, can I just back up to that point? Let's say for the sake of argument that we disagree with the labeling and we say, no, in effect, the claim that the plaintiff has brought here, the debtors brought here is whatever. We'll characterize it as as applied, even though they say that's not the label. We say the substance of their claim effectively is as applied. So we're not going to say that they're out of the box for having abandoned it. So we are in the world, assume of potentially offering a remedy for an as applied challenge. So going back to Judge Radji's question, what would be the remedy if they had an as applied challenge here? So, Your Honor, I think, again, the remedy would still be to best. So you have to get to uniformity, right? And there are two ways to get to uniformity. You can get to uniformity at the higher fees or you can get to uniformity at the lower fees. And we'd submit that when you're talking about, you know, at best a conferral of discretion on the judicial conference to make fees equal. There's no conferral of a discretion, we think, specifically to make the fees unequal. That if you're dealing with this graduated system that says debtors of this size pay this fee, debtors of this greater size pay the next fee, a whole, you know, again, highly reticulated series of fees, you know, based on the size of the debtor. That Congress clearly wanted those extra fees to be paid. You should be equalizing at the up level and not equalizing at the down level. I guess that's my question. So are you proposing that we would order that everyone in a BA district have to go back during that window and go back and pay higher fees? I guess that's my question. Is that the remedy you're proposing? Yes. Judge Ardini, I think since those debtors are not in front of you, I don't think that you can order that. This isn't a basis for these debtors who are subject to the higher fee in the USGP districts to see a reduction. I'm sorry. Go ahead. But again, just assume my hypothetical is that we find a violation of the uniformity clause. Let's just assume that. Are you saying that he gets no remedy? Is that what you're saying? We can't level down. You're saying because Congress wanted these fees. Yes. And that we can't level up because those debtors in the BA districts are in other circuits. They're not before us. So you're saying he has no remedy. Assuming, again, my hypothetical that there's a violation of the uniformity clause. Yes. I mean, perhaps, Your Honor, there's a way for debtors in the different types of zones to unify with each other to bring a kind of systematic challenge. But I don't think that works for these debtors, particularly given what they disclaimed. I'd like to get to the argument, though. Can I? Sorry. But it seems to me the simple outcome here is that we say there is a facial challenge. There's not uniformity. The statute didn't fix the St. Angelo problem because it doesn't say shall. It says may. And so we revert back to where we were the way the Ninth Circuit did, which is that the whole system is broken and you've got to fix it. Congress will fix it. They're smart. Well, Judge Sullivan, we disagree with that. We think, again, that if they have a facial challenge, that they have to meet the Salerno test. Mr. Henze has not made any arguments about the Salerno test, so I think he's waived those. And under the Salerno test, you have to demonstrate that the statute is not constitutional in any circumstance. And they can't meet that test because for all of the time up to 2018, the fees were equal. I understand your argument on Salerno. So something else you wanted to add? Okay, so I wanted to say that even putting aside the Salerno argument, it's entirely possible under the Blanchett case and other cases from the Supreme Court for Congress to draw distinctions between particular areas and then for them to be uniform within those spans. That's why I think Mr. Henze started with the Blanchett case and the supplemental authorities that we filed. Because under that approach, you're dealing with two different systems. You're dealing with the system where Congress saw fit because it saw a problem with a variety of different issues that the U.S. trustee program fixes to establish that U.S. trustee program system. But they came to look at the bankruptcy administrator areas, which was the old preexisting system that was in place everywhere. And they saw in Alabama and they saw in North Carolina that there wasn't a problem. If it ain't broke, don't fix it. And so in light of that, it could be entirely rational for Congress to have two different fee systems, one in the U.S. trustee program areas and one in the North Carolina and Alabama areas. And we think that's also another basis on which we should prevail here. The regional differences line is really where there are distinctions between different regions. Here, it just seems to be that the regional difference is a political. The folks in North Carolina and Alabama had the political juice at the time to opt out. Is that a regional difference that would justify this differential treatment? I think perhaps, Your Honor, an entirely arbitrary political juice situation might not be. But I don't think that's what we're dealing with. I think we're talking about the fact that those areas didn't experience the kinds of problems that led Congress to create the U.S. trustee program elsewhere. And that when there were pilots of that in those areas, they didn't seem to go so well in those areas. And so that's a rational reason for Congress to set up two areas. And the fact that particular congressmen from particular areas had the power to establish what they saw as a rational difference between different areas, I don't think that's something that looking at something like this, and we really haven't talked about the concept of what standard of review applies to constitutional challenges like this. I don't think that's the kind of thing that should be penetrated into if you applied, for instance, rational basis scrutiny for uniformity. And we think that's what you should apply. But if I could make one last point. But what would the conclusion be that if uniformity is required, the bankruptcy administrative system has to provide procedures and substantive law that's the equivalent of what's done under the trustee system. Why wouldn't there still have to be uniformity in those respects? So, Your Honor, that's actually an excellent segue to what I want to make as my last set of points, which is that our threshold argument is that providing fees to administer the U.S. trustee program or the bankruptcy administrator system, that those are not core bankruptcy matters. They're not on the subject of bankruptcy within the meaning of the Article I uniformity provision. There are all kinds of procedural rules, right? So the circuits, for instance, some of them have bankruptcy appellate panels. You know, this circuit does not, but the Ninth Circuit does. Is that something that's a uniformity problem? On Mr. Henze's argument of anything that could potentially affect the bottom line of the debtors, that that is something that's, you know, within the bankruptcy span, that is definitely an overdetermined test. I'm sorry. Please go ahead, Judge. No, no, Judge Radjic, please. My concern with your argument that this is outside the area is that then you have to be under the necessary and proper clause for Congress's authority to act. Is that right? No, Your Honor, I wouldn't say that. And this is another area where I think in terms of the way this case was litigated by the debtors that they fell down on, you know, under the NFIB v. Sebelius case from the Supreme Court, Congress doesn't have to lay out exactly what headings of authority it's proceeding under. No, no, I understand that. But to the extent we're asking you, the one grant of authority is the authority to create a uniform bankruptcy system. And my understanding was you're saying, well, but Congress has the authority to do what's necessary and proper. Yes. To achieve that other grant of authority. But the grant of authority is only to set up a uniform system. So how does the necessary and proper clause expand what Congress can do and give it authority to do things that are not uniform? So, Your Honor, I would say this, right? So the first point is we didn't rely only on the necessary and proper clause. We also pointed out that Congress has an aggregate of powers here under the Commerce Clause and under, because it's using the judicial conference, the power to create, you know, adjunct tribunals, which is, you know, at some level essentially. Well, if you want to go through them one at a time, I'm happy to do that with you. Why don't you start with the necessary and proper clause? Do you think that the necessary and proper clause gives Congress the authority to do anything other than what is necessary to set up a uniform system? So certainly in the Rage case, Your Honor, it was pivotal that there was necessary and proper clause power. So there has to be some additional add-on of the necessary and proper clause. Otherwise, the clause would become surplusage. So, you know, I understand that at some point, right, if you go way past what the core of the Constitution, what an enumerated power is in Article I, that you could fall outside the bounds of the necessary and proper clause too. But we certainly think that the necessary and proper clause has to be given some construction and some span of power. And to read it to embrace doing something ancillary, like a fee system, so that the U.S. trustee program can go, it's kind of the gasoline for the tank of the USTP, that that is something we think would fit within the necessary and proper clause. Okay, so now you want us to find the Commerce clause. Is the power that authorizes Congress to set up different fee structures, depending on whether it's a trustee or a bankruptcy appeal section? So on that, Your Honor, right, consider the fact that it would have been entirely permissible, right, for Congress to create a system where the fees that were running the USTP and the bankruptcy administrator areas were provided from general revenues, right? So the fact that they made a choice to kind of tie it as a kind of user fee into the bankruptcy system, we don't think is a choice of constitutional moment or a choice that would kind of negate Congress being able to use Commerce powers or its powers to raise fees. It's not so clear to me that your adversary might not have an argument if the bankruptcy administrator system were publicly funded and people in the trustee system had to pay. I mean, but I think other judges have questions. Okay, thank you. Sure, I've got nothing further. Nor do I. I think all good things must come to an end. So, Mr. Clark, I'll give you 30 seconds to wrap it up. Sure. Thank you, Your Honor. So we have three arguments. We think that while bankruptcy courts tend to think that anything that has some tie into the bankruptcy area must be under the bankruptcy power, we don't think that under the classic notion that there's a distinction between substance and procedure, that this is a core bankruptcy matter. The Supreme Court has only invalidated one case, the Gibbons case, for the equivalent of a private bill, and that was clearly messing with something that was at the core of bankruptcy about treating debtors differently, providing for ancillary fees, providing for rules, local bankruptcy rules, different kinds of bankruptcy appellate panels. That's not the kind of thing we think fits on the subject of bankruptcy, so we have that defense. Second, you know, we've obviously been talking a lot about the uniformity. I think the simplest way to deal with that is to say that they flunked the Salerno test based on what they disclaimed, including disclaiming challenging the actions of the Supreme Court. I really don't have 30 seconds. I'll rest, Your Honor. Thank you. Thanks. All right, we'll now hear from Mr. Henze for two minutes of rebuttal. You're on mute. Thank you, Your Honor. On whether this is a law on the subject of bankruptcy, it's not just bankruptcy courts. The Ninth Circuit Court of Appeals in the San Angelo case discussed that exact issue at length and found that this is a law on the subject of bankruptcy. Let me stop you there, because it seems to me a facial challenge really then results in us basically going back to the Ninth Circuit's resolution, and that sort of blows the whole thing up. That's not what you're asking us to do. You're just asking us to lower your rates. It's not. I think what the Ninth Circuit said in San Angelo, Your Honor, was to sort of take, I guess I'll call it, the least disruptive, under constitutional principles, take the least disruptive path. So I think the least disruptive path, and the thing I'm challenging here that impacts my clients, is the fee increase. So that is what I'm asking you to overturn. Your Honor. But the facial problem that you're challenging still exists, even if we give you the relief you want, right? And it is subject to repetition. There is a latent problem that still exists, and it is subject to repetition. And as I said, Your Honor, the Congress created this scheme, and in some sense it has relied on the judiciary to bail it out. Well, let me ask you about that. Do you agree that when Congress enacted 1930A7, it was in response to the concern identified in San Angelo? It was. Okay. Now, after it enacted it, the Judicial Conference in 2001 basically concluded that it would impose fees in amounts specified in 1930 and as amended. So I'm a little perplexed as to why they thought they had to take any action in 2013, why the 2001 action wasn't good enough. And similarly, why Congress, in amending the fees, would not have thought there would be an automatic increase by the Judicial Conference in light of their 2001 statement. I think Congress might have thought that. A7 gives the Judicial Conference the discretion to change its mind. And the Judicial Conference had done it in a way that ensured uniformity. Why would Congress have any reason to think it had to change 1930A7 at that point? I think the Congress probably wouldn't have the reason to believe that. But what Congress did was it set up a system that gave the Judicial Conference discretion. And one point here, Your Honor, is if you look at the 2018 Judicial Conference report, this wasn't a mistake. It wasn't that the Judicial Conference didn't understand what it was doing. No, I understand that. There was a lengthy, pages-long discussion of the issue, citing St. Angelo. So the Judicial Conference very well understood what it was doing. And one kind of point that connects, when counsel says that we've abandoned the ultraviolet challenge, we didn't make an ultraviolet challenge. Below, the U.S. trustee argued that the Judicial Conference had acted ultraviolet. The U.S. trustee argued that, really, if you take the Judicial Conference report, that the Judicial Conference had knowingly violated the law. And we disagreed with that. We said the Judicial Conference didn't act ultraviolet. It was granted discretion, and it exercised that discretion. But to your question, Your Honor, A7 gives the Judicial Conference discretion. And I understand what the Judicial Conference said in 2001. But I think it was, if you read the Judicial Conference report, the magnitude of the fee increase, I'll use the word, it was so shocking that I think it gave the Judicial Conference pause. And the Judicial Conference considered it. And I have to believe the Judicial Conference assumed, based on A7, that it had discretion. And it exercised that discretion in a particular way. Well, it didn't act. It didn't act for a while. And then when it finally acted, it acted forward. Well, it didn't act. And if it had acted in March of 2018 for four or five months because it hadn't met or it hadn't come on its radar or something like that, maybe there'd be a little bit of a different argument. But with the Judicial Conference, not only did it act, but it said, we're not going to start until October 1, 2018. And then it's only going to be for cases filed on October 1, 2018 forward. So the Judicial Conference, I argue, knew exactly what it was doing. And either it knowingly vitilated the law, which I'm not prepared to, I'm not going to say that, or it acted within its discretion. And again, to Judge Sullivan's question, there's a latent problem in the statutory scheme, Your Honor, when taken in the context of the Constitution. And the Judicial Conference can save Congress, but this was a political arbitrary distinction. There's no substantive difference between what's going on in Alabama and North Carolina. For what it's worth, I've appeared in cases in North Carolina and Alabama, and I haven't noticed any difference in how cases there are administered. I've dealt with bankruptcy administrators, and it feels the same as dealing with a U.S. trustee. So this was a purely arbitrary political thing. Congress created the problem. The Judicial Conference, in some sense, has fixed the problem for Congress until it didn't. And the Judicial Conference exercises discretion here in a way that didn't fix the problem for Congress. That's what I say. I understand the temporal issue. I understand the Salerno issue. But this is not a question of that we didn't know how something was going to be applied or that the agency had misapplied. Congress said to the agency, the judiciary, here, you get to go do this, and the judiciary did it. There might be problems with the statute that says the judiciary shall do something. There might be a lot of other problems that will result from however we resolve this. But you're asking us to just strike down the increases that kicked in with the 2017 amendments, right? That's right, Your Honor. Any other questions for the panel? Thank you. All right, well, thank you both. Very well argued, very interesting, and we will reserve decision. Thank you, Your Honor.